Green, J.
delivered the opinion of the court-
It is contended by the counsel for the defendant, that Mrs. Loving took an estate in fee to the property in controversy, by the provisions of the second clause of the-will. It is true, that clause of the will, after directing that the land should be sold, and that the proceeds of the sale be laid out in young negroes, further provides, that they he equally divided among his three daughters; but this bequest is to be understood in manner thereafter to be named. The manner here intended is particularly pointed out in the next clause. The assumption, that the property given in the second clause, is not comprehended in the limitation contained in the third clause, is evidently erroneous, as will appear by recurring to the provisions of the three first clauses. In the first clause, the testator *27 loaned to his wife during life, one third part of his estate. The second clause provides for the sale of his land, and purchase of negroes, to be divided among his daughters; and the third clause commences by declaring that he loaned to his three daughters the remaining two-thirds of his estate. It must here be seen, that if one-third was loaned to his wife, by the first clause, and two-thirds were loaned to the daughters, by the third clause, the whole estate would be thus appropriated. Hence it follows, that the negroes, which are directed to be purchased in the second clause, constitute the two-thirds of the estate, which is loaned to the daughters, “during their natural life, and then given to the lawfully begotten heirs of their bodies.”
But it is insisted that Mrs. Loving took an estate in fee, because the words, “heirs of her body,” are words of limitation, and not of purchase, and that this is a case for the application of the rule in Shelley’s case. This rule, as defined by Preston, (Essay on Estates, vol. i. p. 263,) and which Chancellor Kent says, (4 Com. 215) seems full and accurate, as abridged and copied by him, is thus stated; “When a person taires air estate of freehold legally or equitably, under a deed, will, or other writing, and in the same instrument, there is a limitation by way of remainder, either with or without the interposition of another estate, of an interest of the same legal or equitable quality, to his heirs, or heirs of his body, as a class of persons to take in succession, from generation to generation, the limitation to the heirs entitles the ancestor to the whole estate.”
This rule originated in the policy of the feudal tenures, and was adopted to favor the lord, by subjecting the heir to the burdens incident to a descent, from which, as a purchaser, he would have been exempt. It is true, many other reasons have been stated by judges and elementary writers for the rule. These axe collected and examined by Mr. Hays, in his notes and illustrations, (Law Lib. No. 21, note D, p. 43,) where they are all obviated, and *28 the writer concludes: “That the real inducement to the rule was, the prevention of fraud upon feudal tenure; for when the heir came in by succession or descent, and was under age, the lord of the fee was entitled to those grand fruits of rnilitary tenure, wardship and marriage; hut if the heir took by purchase, then only a trifling' acknowledgment for a relief was due to the lo.rd.” This opinion, as to the origin and reason of the rule, Chancellor Kent says, (4 Com. 216, 2d edit.) has been generally followed. To carry into effect this policy, it has been considered that the rule, is of such preremptory obligation, as to he beyond the control of intention, when a fit- case for its application existed. 4 Kent’s Com. 226. Memorable for its antiquity, and for the patient cultivation and discipline which it has received, still as it is a rule purely “arbitrary and technical,” and calculated to defeat the intention of those who are ignorant of technical language;’-’ and as it had its origin and reasons in a state of things at war with our institutions and policy, we cannot perceive that there are just grounds to join Chancellor Kent in his lament over the learning, which he says has been devoted to destruction, by the statute of New York, by which the operation of the rule has been abolished. On the contrary, when we take into view the intricacies and subtleties into which the numerous disquisitions on this subject have descended, involving it, as Chancellor Kent admits, in “involutions wild,” (Com. 226, 2d edit, note a,) and giving birth, as it has, to so much vexatious litigation, as to afford, according to Mr. Hays, (p. 93,) a strong prima facia argument for the abolition of the rule; rye would rather recommend it to the legislature of this State, to follow the example of that of New York.
Notwithstanding these observations are made, we do not say, that if a fit case for the application of the rule, were to arise, it would not be enforced; but the above •considerations are presented, in order to show that there *29 is no reason to construe other words than those embraced in the rule, so as to make them of like meaning, and thereby, justify the application of the rule to them. As, therefore, the rule is purely technical, by which a particular meaning is affixed to certain words, insomuch as to control the intention; it will he left, in its application, to the particular case, and where other words are used, the intention should prevail.
In this will, what are the words ? The testator says, “The remaining two-thirds of my estate, I lend unto my three daughters, Sally Loving, Martha Bernard, and Jin-cy Sadler, to them, during their natural lives, and then given to the lawfully begotten heirs of their bodies.” The word “lend,” is here used, and not the word “give;” and although the former word confers the use for life, and may for some purposes he construed, to mean the same thing as though the latter word had been used; yet the use of the word “lend,” assists in determining what estate the testator intended his daughters should taire. By the use of the words “lend, during their natural "lives,” the intention of the testator is as certainly expressed, and as well understood, to confer on them only a life estate, as it could have been by the use of any form of superadded words. This is more especially manifest, by reference to the words which follow these. He says, after lending to the daughters for life, — “and then given to the lawfully begotten heirs of their bodies.” He uses here, the word “given,” in contradistinction to the word “lend,” the more conclusively to show, that his purpose was, that his grandchildren should take the absolute estate, the use of which, was bestowed on their mothers for life only. By the words, “heirs of their bodies,” therefore, we are to understand children. This being the plain sense of the bequest, we are not to seek to give the words an artificial and technical sense, in disregard of their natural meaning and common sense construction.
Although, therefore, it is true, that where words are *30 used jn devises, which would, in real estate of inherit- . ’ , , , , . anee, give an estate tail; the same words, used m relation to personalty, would give an absolute interest, (See Duncan and wife vs. Martin, Hall and others, decided at this term, reported in 7 Yerg. Rep. 519,) yet, we are not of opinion, that such interest passed in the case before us, to Mrs. Loving; because the words are not such, as in a devise of lands, would have created in her an estate tail. Had it been a devise of real estate, the word lend, would have conferred on Mrs. Loving, only an equitable right to the use of the estate, during her natural life, and the legal title thereto, would have vested in her children, by force of the words, “given to the heirs of their bodies.” It would not, therefore, have fallen within the rule in Shelley’s case, for to do so, the estate which is taken by the ancestor, and that which is limited to the heirs, must be of the same legal or equitable character.
But there is another view in which this case may be considered, which still more clearly shows, that the rule, in Shelley’s case, has nothing to do with it. In the second clause of the will, tire testator directs his land to be sold, and the money arising therefrom to be laid out in young negroes, at the discretion of the executors. This clause contemplates the title to the negroes, to be vested in the executors. With this idea distinctly in the mind, the language of the third clause may be easily understood. In that clause, he says, he lends to his daughters the two-thirds of his estate, during their natural lives, “and then given to the lawfully begotten heirs of their bodies.” The idea conveyed clearly by this language is, that the executors, in whom is vested the title to the negroes, are so to provide, that the daughters of the testator are to enjoy the use of the property dining their natural lives, and then, at their death, the executors are to give the estate to those who may then he heirs of the bodies of his daughters. The same language is repeated in the latter part of the third clause, when he directs *31 the disposition of the one-third, which had been loaned , ,.<• TT T ■ , , to his wile during her hie. He desires, that it may be equally divided among his three daughters, to them lent, during their lives, and then given to the lawfully begotten “heirs of their bodies.” Although the language of this will is not very elegant, yet, to my mind, it is very expressive. He uses the words, “to them lent,” to express his will and desire, that the executors, when the event contemplated may occur, shall lend to the daughters during their lives; and when they die, “then,” the executors are to give to the heirs. In this view of the case, the word, “then,” has its full meaning and significancy, as referring to a gift then to be made by the executors. Thus understood, we see why the word “given” was used, instead of the word give. The language used, is equivalent to the phrase, and “then to be given;” not giving directly himself, but vesting the estate in the executor, who is empowered to lend, and give, as directed in the will. If this be the meaning of the will, and we think it is, it will be at once perceived, that the rule, in Shelley’s case, can have no application here, (it being merely an executory trust,) and that Mrs. Loving took only an interest for life; and after her death, her children, the complainants, were entitled to tire property.
But it is insisted, by the counsel for the defendant, that if the construction here given to this devise, be the true one, still the defendant -must succeed, because Gabriel Loving had possession of the negro Mary, more than five years in this State, and it is insisted, that the limitation was not declared by deed or will, duly proved and recorded, and consequently, by our Statute of Frauds, (1801, ch. 25, sc. 2,) the absolute property was with the possession. Upon this part of the case, the first question is, whether the limitation of this property was declared by the will of old Mr. Norvell? It is argued that it was not, because the negroes did not belong to his estate at his death, and were not designated in the will. This, we *32 conceive, can'make no difference. The land was directed to be sold, and with the proceeds, the negroes were to be purchased, as directed by the second clause of the will; and the thing thus directed to be done, was contemplated as done, in making the disposition contained in the third clause. The executor was only an agent, to carry into effect the directions of the will; and if he had 'made a deed to Mrs. Loving, still she would have held under the will, and not under the deed. A deed, from the executor, would have been a mere matter of form; and it cannot for a moment be supposed, that his omission to execute a deed, shall defeat the. intention of the testator, and the right of the legatees. Equity regards that as done, which should have been done.
The last question is, does our act of 1801, ch. 25, sec. 2, apply to such a case as this? Upon this point the chancellor decided the cause against the complainants. In this, we think, he erred.
The Statute, says, the reservation shall be declared “by will duly recorded, or by deed in writing, acknowledged or proved by one witness at least, in a court of record, and registered in the registers’s office of the county where the goods and chattels, or the most valuable part of them are, within eight months after the execution thereof.”
The Statute clearly contemplated, that the deed was to be registered in the county where the goods were, at the time of the execution thereof. It does not, therefore, embrace a case, where the limitation pr reservation was made by deed or will in another State, where the goods were situate at the time. A foreign will could not lawfully have been recorded in this State, at the time of the enactment of this Statute, nor for many years after-wards. The legislature could not, therefore, have intended to make a provision that would produce the forfeiture of a title, for the non-performance of an act which could not be lawfully done. We are the more satisfied *33 with this construction of the act, because it accords with the opinion of Judge Catron, in the case of Crenshaw vs. Anthony, (Martin and Yerg. Rep. 110,) with whose reasoning we concur.
Let the decree be reversed, and decree for the complainants.
Decree reversed.